UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>ARMANI MINIER-TEJADA,<br>  a/k/a "Shotz", a/k/a "Gustavo".<br><br>    Defendant | No. 21-CR-10099-NMG |

### **GOVERNMENT'S TRIAL BRIEF**

The United States respectfully submits its trial brief in the above-referenced case, which is scheduled for trial on October 18, 2022. The Defendant has elected to proceed pro-se with the benefit of stand-by counsel (Docs. 145, 150, 157).

**I.     BACKGROUND**

The defendant, ARMANI MINIER-TEJADA, is charged in the Third Superseding Indictment with the following crimes:

- Count One: Conspiracy to Manufacture, Distribute and to Possess with Intent to Distribute 400 Grams or More of Fentanyl, 500 Grams or More of a Mixture and Substance Containing Methamphetamine, Cocaine, and Other Controlled Substances, in violation of 21 U.S.C. § 846;

- Count Two, Conspiracy to Use and Carry a Firearm During and in Relation to, and Possess a Firearm in Furtherance of, a Drug Trafficking Crime, in violation of 18 U.S.C. § 924(o);

- Count Three, Use and Carrying, Brandishing and Discharge of a Firearm During and in Relation to, and Possession of a Firearm in Furtherance of, a Drug Trafficking Crime, in violation of 18 U.S.C. § 924(c);

With respect to Counts Two and Three, the Third Superseding Indictment alleges that at least one firearm was a "machinegun" as that term is defined under 18 U.S.C. § 921(a)(24) and 26 U.S.C. 5845(b).

The charges arise from an ongoing drug distribution and manufacturing conspiracy involving the Defendant and a number of coconspirators from the period of roughly January 1, 2019, through March 27, 2021. The conspiracy's members belonged to the Tiny Raskal Gangsters (also known as "TRG") street gang, who obtained large quantities of fentanyl, cocaine, and methamphetamine locally in Massachusetts and then distributed those controlled substances in Maine.  The evidence will show that the conspirators traveled to Maine multiple times per week to deliver drugs and collect money from the drug dealers whom they were supplying.  Some of the evidence supporting the conspirators' drug trafficking consists of extensive text communications between the Defendant and his suppliers and customers concerning the manufacturing and distribution of multiple kilograms of fentanyl, cocaine, and methamphetamine.

In addition to drug trafficking, part of the conspiracy also involved obtaining firearms from Maine that the conspirators would bring down to Massachusetts.  The Maine drug customers at times served as straw purchasers for firearms both from federal firearms dealers and individual sellers.  The Defendant and his coconspirators used the firearms to protect themselves, their drug inventory, and their drug proceeds.  They also used such firearms to bolster their reputation on the street and target rivals.  In particular, the anticipated trial evidence will show that the Defendant and his coconspirators possessed the firearms and engaged in a number of shootings.  The government anticipates introducing testimony from cooperating witnesses concerning the Defendant's participation in this drug and firearm conspiracy as well as the Defendant's commission of and/or participation in at least six shootings.  The government also anticipates introducing dozens of images and videos showing the Defendant and coconspirators possessing firearms, shooting firearms for target practice, displaying large quantities of drugs and drug proceeds, as well as other activity related to the drug and firearm conspiracy.

**II.     SUMMARY OF THE ANTICIPATED TRIAL EVIDENCE**

The government provides the following summary of the evidence that it anticipates introducing at trial.

**A.     The Drug Conspiracy**

The government expects to offer testimony from multiple cooperating witnesses regarding the Defendant's participation in an ongoing drug conspiracy involving the manufacture, distribution, and possession with intent to distribute multiple kilograms of cocaine (in base and powder form), fentanyl, and methamphetamine. Charged coconspirators include Jaiir Coleman, Klein Ulysse,[1] David Oth[2], Phillips Charles and Christina Bernbaum; unindicted coconspirators include J.M., M.C., and J.H.[3]  The government anticipates filing a motion to admit evidence of gang membership from two cooperating witnesses who were members of TRG with the Defendant. This evidence will serve to explain (1) the nature of the relationship between the Defendant and the cooperating witnesses and (2) the Defendant and coconspirators' motivations and willingness to engage in drug distribution and shootings and firearm offenses expected to be referenced at trial.

Evidence, including witness testimony, will show that conspiracy members obtained multiple kilograms of fentanyl, cocaine, and methamphetamine and sold those drugs in Maine because it yielded greater profits than what could be obtained locally in Massachusetts.  Witness testimony will establish that the Defendant and supply-side coconspirators typically made two to three trips per week to Maine to re-supply the Maine-based dealers with drugs and to collect money owed for previously provided drugs. The government expects one such Maine-based dealer to testify as a cooperating witness.

---

[1] Charged separately by Information in 21-CR-10077-LTS.

[2] Charged separately by Information in 21-CR-10187-MLW.

[3] The identities of these individuals have been disclosed to the Defendant.

The government anticipates introducing evidence that the Defendant coordinated drug deliveries with Maine-based dealers by telephone and via text messages. The anticipated trial evidence will consist of hundreds of text messages, images, and videos sent from the Defendant's phones to Maine-based dealers coordinating these deals and discussing the operation. Evidence, including cooperating witnesses and an experienced digital media witness, will show that the Defendant's drug-related communications with the Maine-based dealers were explicit, including the sharing of images, videos, and discussions and negotiations about drug type, quantity, quality, pricing, payments owed, and the coordination of large cash pickups. The government also anticipates introducing numerous videos from the various seized cellphones showing the Defendant handling large quantities of drug proceeds (cash and jewelry), which cooperating witnesses are expected to characterize as purchased with drug proceeds generated by the conspiracy.

### B.   The Firearm Conspiracy

While the conspiracy's Maine activities centered on drug trafficking, the government expects to introduce evidence showing that TRG members did not simply supply large quantities of drugs and collect drug proceeds but that they also procured dozens of firearms during their Maine trips, which they then brought back to Massachusetts. The government expects to present testimony from a Maine drug customer, now a cooperating witness, who purchased multiple firearms for the Defendant and Coleman from firearm dealers and private sellers. Once in Massachusetts, conspiracy members either sold the firearms or kept them for personal use.

The government plans to present evidence at trial showing that those firearms served numerous purposes for the conspirators. In particular, evidence will show that the Defendant, Coleman, and Ulysse filmed videos with these firearms (and drugs and money), which they

transmitted via social media to others advertising their success in drug dealing and their readily available firepower. The government also anticipates introducing testimony from multiple cooperating witnesses regarding the Defendant and TRG members' use of firearms in shootings of rival gang members, which further served to enhance and promote their reputation for violence.

The evidence will show that in addition to purchasing firearms, the Defendant and Coleman also possessed three so-called "selector switches" (i.e., auto sears), which served to convert certain semi-automatic handguns into machineguns by enabling them to fire multiple rounds with a single pull of the trigger (i.e., fully automatically). According to a cooperating witness, Coleman had one firearm with a selector switch, the Defendant had another, and they shared a third. According to cooperating witness testimony, these selector switches were obtained from a Lynn-based drug dealer Vincent Caruso, a/k/a "Fatz"[4] for approximately $800 each.

Evidence supporting the Defendant's and coconspirators' firearm possession will include text messages from the cellular phones seized in this case in which the Defendant discussed guns he was possessing and their use. The government also anticipates introducing extensive video evidence from the various cellular phones seized in this case depicting the Defendant and other coconspirators in possession of numerous firearms, drug proceeds, and drugs. Lastly, the government anticipates introducing a selfie-style Snapchat video taken in October 2020 by the Defendant showing himself holding a machinegun, specifically, a firearm with a selector switch that was later recovered during Coleman's arrest on January 6, 2021.

### C. Specific Incidents

In addition to presenting extensive testimony from cooperating witnesses generally describing the scope, nature, and operations of the charged drug and firearm conspiracy, the

---

[4] Charged separately by Indictment in Docket No. 21-CR-10312-DJC.

government also anticipates introducing evidence of specific incidents during the conspiracy involving the Defendant, which include multiple shootings. The government expects to present evidence addressing law enforcement's investigatory efforts, which include execution of search warrants that resulted in the seizure of phones, drugs, firearms, and other relevant evidence. Below is a list of the specific incidents on which the government expects to present evidence. The government anticipates filing motions *in limine* addressing evidentiary issues related to these incidents:

- **May 25, 2020: Shooting in Somerville** – The government anticipates introducing evidence that includes cooperating witness testimony and potential other sources of proof (e.g., photographs, audio from ShotSpotter and/or 911 recordings) regarding the Defendant's presence during a shooting in Somerville that also involved Ulysse and Coleman.

- **July 1, 2020: Arrest of Ulysse and Recovery of Six Firearms** – The government anticipates introducing the firearms, photographs, and both law enforcement and cooperating witness testimony concerning this incident. Videos recovered from Ulysse and Coleman's respective phones show the Defendant, Coleman, and Ulysse firing the same firearms recovered from the vehicle in the woods the day before Ulysse's arrest.

- **July 2, 2020: Shooting in Cambridge** – The government anticipates introducing testimony and photographs of the crime scene from responding officers and crime scene technicians, expert testimony from ShotSpotter for the gunfire audio, expert witness testimony for the toolmarking evidence, testimony regarding historical cell site location information, 911 recordings, and cooperating witness testimony that establishes the Defendant's presence and involvement in the Cambridge shooting. In particular, the government expects cooperating witness testimony to establish that this shooting involved automatic fire from a 9mm firearm with a selector switch attachment.

- **January 6, 2021: Coleman's Arrest** – The government expects to present evidence, including testimony from law enforcement officers, cooperating witnesses, and expert testimony (regarding a seized firearm and its characteristics qualifying as a machine gun) in connection with Coleman's arrest, which occurred soon after law enforcement surveilled Coleman leaving the Defendant's residence to participate in a drug deal. The government also expects to introduce text messages that the Defendant sent to various Maine-based drug dealers in which he vocalized concerns about Coleman's arrest that had resulted in the recovery of a "glock high capacity with automatic on it." The government expects to introduce these communications and others concerning this incident at trial.

- **February 7, 2021: Fight at Logan Airport** – The government anticipates introducing witness testimony (including cooperating witness testimony) that the Defendant was attacked at Logan Airport by suspected gang rivals who stole the Defendant's diamond-encrusted medallion stating his street name, "Shotz." Anticipated evidence, including text communications between the Defendant and coconspirator David Oth, show the Defendant discussing the need to retaliate against those rival gang members. The Defendant would also commission a replacement medallion that was later seized by FBI during the investigation.

- **February 8, 2021: Oth Recording** – The government expects to introduce evidence via a cooperating witness of an audio-video recording showing that witness's receipt of cocaine base from Oth in February 2021.[5] The recording, in total, is approximately thirty minutes in length. The government expects to provide a transcript of this recording to the jury during its presentation. During the recording, Oth told the cooperating witness that he (Oth) had recently given "Shotz" (the Defendant) a pound of methamphetamine and that he (Oth) had also told the Defendant three pounds of methamphetamine were ready for the Defendant to have.

  o Text communications from both the Defendant and Oth's devices, which the government anticipates presenting at trial, will show that Oth contacted a "Shots" regarding "3 pounds" that he had "for u when u need it jus holla" in late January 2021.

- **February 24, 2021 – Search of Oth's Residence** – The government expects to introduce evidence of law enforcement's seizure of three pounds of methamphetamine and two firearms from Oth's residence on February 24, 2021 (along with Oth's cellphone) during the execution of search warrants. That evidence will include law enforcement testimony, physical evidence recovered, photographs of the search scene, and drug analysis testimony from DEA chemists.

  o The government also anticipates introducing text communications between the Defendant and Maine-based dealers from the morning of Oth's search warrant indicating that the Defendant had been waiting on a delivery of methamphetamine but that his supply source had been raided that same morning. Part of those text communications will include the Defendant transmitting a video of the FBI executing the search warrant at Oth's residence explaining the delay in delivering methamphetamine to that customer.

- **March 24, 2021: Search of Defendant's Residence** – The government expects to offer testimony, including from law enforcement witnesses, cooperating witnesses, and drug analysis testimony from a DEA chemist, as well as photographs and physical evidence, regarding law enforcement's search warrant execution at Defendant's residence at 4 First Street, Salem, Massachusetts, resulting in the recovery of a blender (containing

---

[5] The government will be filing a motion further addressing the Oth's recording's admissibility in accordance with the Court's pretrial deadlines.

fentanyl residue), cutting agents, scales, plastic bags, heat sealer, cash, a money counter, receipts for cash purchases, and a cellphone belonging to the Defendant.

- **March 26, 2021 – Defendant's Arrest in Maine** – The government will present law enforcement testimony, physical evidence, and photographs regarding the Defendant's arrest at an AirBnB rental in Maine and law enforcement's execution of a search warrant at that location.

- **March 26, 2021 – Search of Kleffman Vehicle and Residence; Arrest of Kleffman** – The government anticipates offering photographs, physical evidence, and testimony from law enforcement officers, cooperating witnesses, and DEA chemists regarding the arrest of Kleffman following a traffic stop, which resulted in the recovery of drugs and a phone. The government expects to introduce evidence showing that Kleffman (who was wearing an Apple watch at the time of arrest) alerted the Defendant to her arrest. The government also anticipates introducing photographs and testimony from law enforcement officers, cooperating witnesses, and DEA chemists regarding a search warrant's execution at Kleffman's residence the same day as her arrest.

### D.  SnapChat Evidence

The government expects to introduce records and videos obtained from SnapChat for the Defendant's identified account, "Armani_ebk". These records will be offered through a certification from Snapchat under Fed. R. Evid. 902, and testimony of SA Mattheu Kelsch ("SA Kelsch") concerning the authenticity of the records. Subscriber information for this account associated it with a phone number used by the Defendant ending in 6085. The government anticipates witness testimony and digital information from the Defendant's cellular phones that the "Armani_ebk" account is the Defendant's account.

### E.  Cellular Phone Evidence

The government intends to introduce content from a number of cellular phones recovered in this case.[6] Absent stipulations, the government anticipates eliciting the following sequence of testimony: the authenticating witness (e.g., officer who recovered the phone or cooperating witness familiar with the device); the forensic extraction expert who processed each device and generated

---

[6] The government will be filing a motion addressing the admissibility of this content in accordance with the Court's deadlines.

the forensic extractions of the phones; and the content witness, who will either be (1) a cooperating witness who is familiar with the video/image or participated in the conversation itself or (2) SA Kelsch, a forensic examiner who retrieved the contents from the forensic extraction.

The government anticipates that multiple cooperating witnesses will narrate the text communications they had with the Defendant and explain certain terminology and context therein. The government also expects to review selections of the conversation with SA Kelsch, and – depending on the efficiency of the government's presentation – seeking summary testimony from SA Kelsch under Fed. R. Evid. 1006.

### III.   ANTICIPATED TRIAL MATTERS

The evidentiary presentation in this trial is expected to include multiple different types of evidence and areas of expert testimony. As noted herein, the government expects to file additional motions regarding such evidence and its admissibility.

#### A.   Recalling of Certain Government Witnesses

In order to have certain evidence properly admitted in a logical order and for use when cooperating witnesses testify, the government respectfully informs the Court that it may seek leave to call certain law enforcement witnesses multiple times. For example, certain witnesses may initially be called to lay a foundation for chain of custody, recovery of certain evidence, and/or digital extractions of cellular devices prior to a cooperating witness's testimony. Alternatively, the government may request the Court admit certain exhibits *de bene*, with foundational testimony admitted later.

#### B.   Certain Digital Evidence

The government anticipates moving *in limine* and seeking authentication pursuant to certification under Fed. R. Evid. 901(b)(9), 902(11), (12), and (13) for certain items in advance of

trial. These certifications pertain to the forensic images of numerous cellular phones seized during the case, as well as data received from SnapChat for an account that the Defendant used. The related certifications and associated data or records will be produced to the Defendant upon completion in the coming days.

### 1.      Phone Extractions

The government anticipates moving *in limine* in order to authenticate certain data that Regional Computer Forensics Laboratory ("RCFL") personnel forensically extracted from phones seized during this investigation through the use of sworn certifications under Fed. R. 902(13), (14). Forensic Examiners Yu Kajita and Cameron Davis may also testify as expert witnesses and introduce the device reports from their forensic extractions of the various devices.

The government also plans to introduce testimony from SA Kelsch regarding his review of the extractions conducted by Kajita and Davis, and his comparison of the MD5 hash of the forensic image generated during the extraction process and the forensic image that he himself reviewed, and his determination that the MD5 hashes matched. SA Kelsch will testify about his review of the various phone extractions' contents, including the association of those devices with certain phone numbers and user accounts on the device, as well as the presence of certain activity, content, and information that was generated from the extractions. SA Kelsch will introduce content himself and explain its origin and significance. Other exhibits, such as videos taken by cooperating witnesses or conversations between a cooperating witness and the Defendant, are expected to have previously been introduced via cooperating witness testimony. For those exhibits already admitted, SA Kelsch will testify to the authenticity of the exhibits and the origin of the previously introduced conversations, images, or videos, confirming their authenticity, forensic integrity, and origin as being from the forensic extraction of the cellular phone at issue. The government

anticipates moving *in limine* regarding SA Kelsch's lay opinion concerning the interpretation of certain drug and firearm terminology. Cooperating witnesses will provide similar interpretation of commonly used terminology.

### 2. Phone Records (Call Detail and CSLI) and Related Maps

The government intends on introducing subscriber information, call detail records, and cell site location information ("CSLI") for certain cellular phones at issues in this case. The government anticipates filing a motion *in limine* and certificates pursuant to Fed. R. Evid. 902(11), (13), (14), concerning the authentication of subscriber information, call detail records, and CSLI pertaining to the Coleman phone ending in 9197 (Verizon) and the Defendant's phone ending in 9241 (T-Mobile). If necessary, keepers of the records may testify concerning the business record foundation and the nature of the records.

The government anticipates SA Kevin Hoyland of the FBI Cellular Analysis Survey Team ("CAST") testifying as an expert witness as to the manner and means of how cellular networks operate, the technologies used, estimated ranges of cell sites, how the range of a cell site is affected by certain factors, and other related topics more specifically described in the expert witness disclosures. See Fed. R. Evid. 901(b)(1), (3), (9). More specifically, the government anticipates SA Hoyland testifying regarding review of the CSLI records for phone numbers associated with Coleman and the Defendant, and the use of certain cell sites during specific, relevant time periods of the charged conspiracy, such as the July 2, 2020 shooting. Additionally, SA Hoyland is expected to testify concerning the absence of the devices associated with Coleman and the Defendant from the cellular network during pertinent periods. The government anticipates admitting a map generated by SA Hoyland from the CSLI records for Coleman and the Defendant, the underlying records for which will be introduced into evidence. See Fed. R. Evid. 1006. SA

Hoyland may also provide testimony as to the presence or absence of certain activity, and call detail connectivity based on his review of those phone records as well.

### C. ShotSpotter

The government intends to offer the testimony of Walter Collier, a Forensics Services Manager with ShotSpotter, as an expert witness who will offer testimony concerning the ShotSpotter system that captured audio for two shooting incidents (May 25, 2020 in Somerville and July 2, 2020 in Cambridge). Specifically, this testimony will relate to the existence of the system, the manner of its operation, and its capabilities to geo-locate the source of gunfire through multilateration, i.e., comparison of times when gunfire incidents are recorded by microphones located throughout the city. Additionally, Collier will authenticate the audio recordings of the gunfire from the shooting incidents, including the date, time, and the municipality of where the recordings of the gunfire were captured.

### D. Prior Consistent Statements of Cooperating Witnesses

#### 1. Prior Identifications of CW-2

The government may seek to introduce prior statements of identification made by CW-2. While substantively admissible by rule, they also serve a non-hearsay purpose: they establish that CW-2 made such identifications at certain times in this case. Specifically, CW-2 identified the Defendant and Jaiir Coleman out of separate photo arrays in September 2020 and provided their street names. These identifications are admissible as prior statement of identification under Fed. R. Evid. 801(d)(1)(C). Additionally, these identifications took place well before investigators had developed additional evidence or identified other cooperating witnesses, and thus the timing of the identification has independent probative value.

#### 2. Grand Jury Testimony

Given the anticipated nature of the defense case, the government believes it may seek to substantively admit prior sworn consistent statements (i.e., grand jury testimony) under Fed. R. Evid. 801(d)(1)(B) to counter challenges to cooperating witnesses' credibility.

### E.     Massachusetts RMV Records and Images

The government intends to offer certified Massachusetts RMV records and images of the Defendant, Coleman, Oth, and potentially others. These records have been certified by the record keeper of the government agency and are self-authenticating. See Fed. R. Evid. 902(4).

### F.     Toolmarking, Ballistics, and Firearm Analysis

The government intends to offer expert testimony about toolmarking comparison as it relates to the July 2, 2020 shooting. Sergeant Kevin Callahan is the government's anticipated ballistician who will testify about his toolmarking comparison of the recovered casings, and individualization of the casings to having been fired by six separate firearms.

Additionally, the government anticipates introducing law enforcement testimony explaining why certain firearms recovered during Ulysse's July 1, 2020 arrest and Coleman's January 6, 2021, arrest constitute firearms under federal law. That law enforcement testimony will address the recordkeeping process and registration requirements of machineguns. Certifications from the ATF Keeper of the Records will be introduced showing that the Defendant and Coleman were not lawful registrants of any machineguns or any other weapons required to be registered under the National Firearms Act.

Further, the government expects to introduce law enforcement testimony from Trooper Pierce the ballistician who examined and test-fired Coleman's machinegun recovered on January 6, 2021. Among other matters, Pierce will describe what an auto sear (or selector switch) is, how it functions within a firearm to convert that firearm into a machinegun, and will explain why the

January 2021 seized firearm constitutes a machinegun under federal law. The government also expects cooperating witness testimony as to this firearm and its functionality as a machinegun.

## IV.     STIPULATIONS

The government has requested stipulations relating the drug analysis, forensic examination of cellular phones, and business records of phone carriers and luxury retailers, through standby counsel. The government has not yet been informed of the Defendant's position.

## V.     VOIR DIRE

The government will file proposed voir dire questions separately.

## VI.     PROPOSED JURY INSTRUCTIONS

The government will file proposed jury instructions separately in accordance with the Court's pretrial order. The government expects that its instructions will largely mirror the pattern instructions for the First Circuit, with adaptations in accordance with authority cited.

## VII.     SPECIAL REQUESTS

As previously noted, given the anticipated length and number of witnesses, and the involvement of certain out-of-state witnesses, the government expects that it may need to call certain witnesses out of order. The government may also need to admit such witnesses' testimony *de bene*, consistent with the overall presentation described herein, if their respective testimony's relevance has not yet been established. The government also may seek to recall certain law enforcement witnesses so as to introduce certain evidence in close proximity to cooperating witnesses' testimony.

Lastly, the government anticipates referencing certain evidence during its opening. The government expects to use a posterboard chalk and PowerPoint during its opening to explain the chronology of certain incidents (i.e., the arrests, searches, shootings described herein) and provide

an overview of conspiracy members, including their identities and respective roles. The government will share this chalk and PowerPoint with standby counsel as soon as it is completed.

        Respectfully submitted,

        JOSHUA S. LEVY
        Attorney for the United States,
        Acting Under Authority
        Conferred by 28 U.S.C. § 515

By:    */s/ Philip A. Mallard*
        Philip A. Mallard
        Kaitlin R. O'Donnell
        Assistant U.S. Attorneys

**CERTIFICATE OF SERVICE**

The government hereby certifies that the foregoing was this day filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing ("NEF") and paper copies will be sent to the Defendant, Pro-Se at the Wyatt Detention Center in Central Falls, Rhode Island.

        */s/ Philip A. Mallard*
        Philip A. Mallard
        Assistant U.S. Attorney

Date:  September 2, 2022